UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GLOBE METALLURGICAL INC.
1595 Sparling Road
P.O. Box 157
Beverly, OH 45715,

    Plaintiff,

  v.

RIMA INDUSTRIAL S.A.
Distrito Industrial de Bocaiúva, S/N
Distrito Industrial-Bocaiúva
MG-CEP 39390-000
Brazil

POLYMET ALLOYS, INC.
1701 Providence Park, Suite 100
Birmingham, AL 35242

RICARDO A. VICINTIN
Rua Garcas, 108
Condominio Estancia Serrana
Nova Lima
MG-CEP 34000-000
Brazil

BRAULIO M. LAGE
1701 Providence Park, Suite 100
Birmingham, AL 35242

RIMA HOLDING USA, INC.
1701 Providence Park, Suite 100
Birmingham, AL 35242

MISSISSIPPI SILICON LLC
East of County Roads 210 and 365
Burnsville, MS 38833

   and

Civil Action No. _____

JOHN DOE NOS. 1 through 50,      )
                                        )
                Defendants.      )

**COMPLAINT**

Plaintiff Globe Metallurgical Inc., for its complaint against defendants Rima Industrial S.A.; Polymet Alloys, Inc.; Ricardo A. Vicintin; Braulio M. Lage; Rima Holding USA, Inc.; Mississippi Silicon LLC, and John Doe Nos. 1 through 50, states as follows:

**NATURE OF ACTION**

1.    This complaint is based upon a series of criminal and otherwise unlawful actions by defendants that have enabled Rima Industrial S.A. to evade United States antidumping laws, while dumping silicon metal imported from Brazil in the U.S. market at unfairly low prices. In the early 1990s, the U.S. Department of Commerce determined that Brazilian silicon metal producers, including Rima, had sold silicon metal in the U.S. at unfairly low or "dumped" prices and issued an order imposing antidumping duties on such imports. Defendants successfully conspired to obtain revocation of the Commerce Department antidumping order through a series of willful and intentional misrepresentations that victimized plaintiff Globe Metallurgical Inc., since 2005, the sole United States merchant manufacturer of silicon metal; the U.S. government; and others. By concealing the true nature of Rima's relationship with its U.S. affiliate, Polymet Alloys, Inc., defendants fraudulently induced the Commerce Department to revoke the antidumping order, thereby enabling Rima to resume its anticompetitive practices free from the order's price restraints and other government scrutiny. Defendants' fraudulent concealment of Rima's affiliate relationship with Polymet continues to the present date. Defendants are now investing the proceeds of their illegal course of conduct in the construction of a new silicon metal manufacturing plant in Mississippi, relying on further fraudulent misrepresentations to secure

permits for that facility. Globe seeks, among other things, declaratory and injunctive relief, compensatory, treble, and punitive damages attributable to violations of (a) the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"); and (b) state common law.

## PARTIES

2.   Plaintiff Globe Metallurgical Inc. ("Globe") is a corporation organized under the laws of Delaware with its principal place of business in Beverly, Ohio.

3.   Defendant Rima Industrial S.A. ("Rima") is a corporation organized under the laws of the Federal Republic of Brazil with its principal place of business in Bocaiúva, Minas Gerais, Brazil.

4.   Defendant Polymet Alloys, Inc. ("Polymet") is a corporation organized under the laws of the state of Alabama, with its principal place of business in Birmingham, Alabama.

5.   Defendant Ricardo A. Vicintin ("Vicintin") is the Chief Executive Officer and President of Rima, an officer of Rima Holding USA, Inc., and a member of the Board of Directors of Mississippi Silicon LLC.

6.   Defendant Braulio M. Lage ("Lage") is the Chief Executive Officer of Polymet and a member of the Board of Directors of Mississippi Silicon LLC.

7.   Defendant Rima Holding USA, Inc. ("Rima Holding") is a corporation organized under the laws of the state of Delaware, with its principal place of business in Birmingham, Alabama. Rima Holding owns a majority interest in Mississippi Silicon LLC.

8.   Defendant Mississippi Silicon LLC ("MS Silicon"), is a limited liability company organized under the laws of the state of Ohio, with its principal place of business in Burnsville, Mississippi.

## JURISDICTION AND VENUE

9.   This action arises under 18 U.S.C. § 1964 and 28 U.S.C. §§ 2201, 2202, and 1651, with pendent state claims for tortious interference with business relations, tortious interference with prospective advantage, and civil conspiracy.

10.   This Court has subject matter jurisdiction of this action under 18 U.S.C. § 1964(a) and (c), 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 28 U.S.C. § 1367.

11.   This Court has personal jurisdiction over defendant Rima based on its purposeful transaction of business in this District, including multiple fraudulent requests submitted to the U.S. Department of Commerce in this District seeking review and revocation of the 1991 antidumping duty order covering imports of silicon metal from Brazil.  The Court has personal jurisdiction over defendants Polymet, Vicintin, and Lage because they conspired with Rima to conceal Rima's affiliate relationship with Polymet to obtain revocation of the antidumping order, and one or more of the conspirators took acts in furtherance of the conspiracy in this District, as further alleged below.  The Court has personal jurisdiction over defendants Rima Holding and MS Silicon because they are part of the ongoing conspiracy to divert illegally-acquired funds attributable to revocation of the order to the construction and operation of the new MS Silicon plant.  The Court has personal jurisdiction over all defendants because a substantial part of the tortious conduct giving rise to Globe's claims occurred in this district.

12.   This Court has supplemental jurisdiction over all state claims against defendants under 28 U.S.C. § 1367 because such state claims are so related to claims in the action within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  None of the state claims raises a novel or complex issue of state law or substantially predominates over the claims over which this Court has

original jurisdiction. There are no exceptional circumstances that present a compelling reason for this Court to decline jurisdiction over the state claims.

13. Venue is proper in this District as to the claims and defendants pursuant to 18 U.S.C. § 1965(a), (b), and (d), and the ends of justice, and 28 U.S.C. § 1391(b), (c), and (d). A substantial part of the events or omissions giving rise to Globe's claims occurred in this District.

## ALLEGATIONS RELATING TO ALL COUNTS

### A. Globe's Business

14. Globe is headquartered in Beverly, Ohio, and is a leading manufacturer of silicon metal and silicon-based ferroalloys commonly called "foundry alloys."[1]  Globe is one of the largest silicon metal manufacturers in the world based on capacity and has been the only such merchant manufacturer of silicon metal in the United States since December 2005 when Globe acquired the U.S. silicon metal operations of Elkem Metals and certain of its U.S. affiliates ("Elkem"), the only other United States merchant producer.

15. Silicon metal is a product composed almost entirely of elemental silicon,[2] along with small amounts of other elements such as iron, calcium, and aluminum. Silicon metal is classified as a "metalloid" because it has some, but not all, of the characteristics of a metal.

16. Silicon is found in nature only in the form of silica (a combination of silicon and oxygen). Silicon metal is produced by combining quartzite (a rock consisting mainly of crystallized silica), a source of carbon (such as low-ash coal, petroleum coke or charcoal), and a bulking agent (such as wood chips) in an electric arc furnace and heating the furnace to a

---

[1]  Ferroalloys are alloys of iron and one or more other elements, such as manganese or silicon, used as a raw material in the production of steel or iron. The silicon-based foundry alloys produced by Globe contain silicon, magnesium, calcium, rare earths, and other elements. They are used by the iron foundry industry.

[2]  Silicon metal normally contains at least 98.50 percent silicon by weight.

temperature of approximately 3,000 degrees Fahrenheit.   At that temperature, the oxygen separates from the silicon and combines with the carbon, leaving elemental silicon.[3]   Molten silicon metal collects at the bottom of the furnace, and is then drained ("tapped").   The molten material is poured into molds, cooled and broken into large lumps.   The lumps are then crushed into smaller pieces and sized (to meet producer or customer specifications).

17.   Silicon metal is principally used by the aluminum industry as an alloying agent in the production of primary and secondary aluminum and by the chemical industry in producing a family of organic chemicals known as silicones.[4]   Silicon metal is a required component of aluminum casting alloys.   Increasingly, silicon metal also is being used to produce polysilicon for use in making solar cells.

## B. The United States Silicon Metal Market

18.   Silicon metal is generally considered to be a "commodity product," because the material is interchangeable, whether produced in the United States, Brazil, China, Russia, or any other country.   Although silicon metal is sometimes described in terms of different "grades," there is no uniform classification system.   The term "grades" actually refers to ranges of specifications that are typically sold to particular types of customers.   These specifications relate to the amounts of silicon and impurities (such as iron, calcium, aluminum, or titanium) found in the silicon metal product.

19.   There are three primary markets in the United States for silicon metal:  (a) chemical (including silicones and polysilicon), (b) primary aluminum, and (c) secondary aluminum.

---

[3]   The chemical reaction can be summarized as follows:  $SiO_2$ (silica) + 2C (carbon) $\rightarrow$ Si (silicon metal) + 2CO (carbon monoxide).

[4]   Silicones are used in a wide variety of applications, including resins, lubricants, plastomers, antifoaming agents and water-repellant compounds.

Importantly, production of silicon metal for various types of customers is not mutually exclusive. Indeed, silicon metal producers -- both domestic and foreign -- typically manufacture a single product that satisfies the specifications of the customers in all three market segments.

20. Because silicon metal from numerous sources will meet the requirements of U.S. consumers, competition among suppliers is intense and price-sensitive. There is an efficient flow of information about price in the U.S. market. Trade publications such as *Metals Week* and *Ryan's Notes* publish information about current prices on a weekly basis. In addition, consumers may reveal to suppliers the prices at which they are being offered material by competing suppliers. Relatively small differences in price often lead consumers to switch suppliers.

21. Because of the fungible nature of silicon metal and the speed with which market prices react to changes in market conditions, contract prices may contain price adjustment mechanisms keyed to "reference prices" – such as the published prices in *Metals Week* and *Ryan's Notes*. Such price adjustment mechanisms and other factors make domestic suppliers highly vulnerable to the effects of an increase in low-priced silicon metal imports, which will cause an overall decline in the market price. Furthermore, despite the existence of different prices for different grades, generally only one price is published, that for secondary aluminum grade silicon metal. This single price influences the prices for the other grades by varying degrees and results in similar trends for all prices.

### C. Competition from Imports and Regulation of Imports

22. As noted above, the U.S. silicon metal market is highly competitive, and there are multiple suppliers of imported material. Foreign producers have an incentive to export silicon metal to the United States because this country is one of the largest consumers of silicon metal, and prices tend to be higher here. Exporters in certain countries – notably China, Russia, and Brazil – have been found to be "dumping," *i.e.*, selling silicon metal to United States customers

at unfairly low prices.   Domestic silicon production serves a number of domestic industries, including manufacturing industries.   Further, having a domestic source of silicon metal benefits the domestic market by securing a steady supply of an important industrial product that can be produced and transported at reasonable prices.   The dumping of silicon metal on the domestic market by foreign sources threatens the domestic supply of the product and associated economic benefits.

23. The United States and other countries have addressed the problem of trade distortions caused by dumping silicon metal and other products in a dual manner:   first, by enacting statutes (in the U.S., the Tariff Act of 1930[5]), under which private parties can seek the imposition of antidumping duties to offset the unfairly low pricing of dumped imports; and, second, by becoming signatories to international trade agreements providing for the imposition of antidumping measures.[6]   Unfair dumping practices can severely damage or even eliminate a domestic industry and lead to domestic dependency on foreign sources.   By enacting the Tariff Act and other antidumping measures, Congress intended to protect, *inter alia*, the class of domestic suppliers and users of domestic silicon metal.

24. In 2000, Congress enacted the Continued Dumping and Subsidy Offset Act,[7] commonly known as the "Byrd Amendment," to provide for the annual distribution by the U.S.

---

[5]   The Tariff Act of 1930, as amended, contains comprehensive provisions relating to many aspects of U.S. international trade.   The Act's provisions concerning antidumping and countervailing duties are primarily set forth at subtitle IV, 19 U.S.C. §§ 1671 *et seq.*

[6]   *See, e.g.*, Agreement on Implementation of Article VI of the GATT 1994, 1994 WL 761483, reprinted in The Results of the Uruguay Round and Multilateral Trade Negotiations:   The Legal Texts, 168-69 (GATT Secretariat, 1994); Agreement on Subsidies and Countervailing Measures, 1994 WL 761793, reprinted in The Results of the Uruguay Round and Multilateral Trade Negotiations: The Legal Texts, 264-314 (GATT Secretariat, 1994).

[7]   19 U.S.C. § 1675c.

government of antidumping and countervailing duties to the domestic producers who supported the trade actions. The Commissioner of Customs paid out over $1.3 billion in the first four years of such distributions.

25. The World Trade Organization, however, was critical of the Byrd Amendment, finding that it provided an improper economic incentive by encouraging companies to use the antidumping and countervailing duty laws. In January 2003, the WTO declared the Byrd Amendment to be impermissible. The United States stated its intention to abide by the ruling, and the Byrd Amendment was repealed on February 8, 2006. Under the repealing legislation, however, antidumping and countervailing duties on entries through September 30, 2007 are disbursed by the U.S. government to qualifying domestic producers.

26. Notwithstanding the repeal of the Byrd Amendment, the sale of imported products in the U.S. at unfairly low or "dumped" prices remained an unfair practice subject to recourse under applicable U.S. laws and treaties, and remains so to this day.

**D. Rima's History of Illegal Dumping of Silicon Metal**

27. In 1990 and 1991, the Commerce Department determined that Brazilian silicon metal producers, including Rima, had sold silicon metal in the U.S. market at unfairly low or "dumped" prices. The U.S. International Trade Commission found that the dumped imports of silicon metal from Brazil had caused material injury to the U.S silicon metal industry, including Globe and Elkem, whose silicon metal operations Globe would later acquire in 2005. As a result, the Commerce Department issued an order in 1991 that imposed substantial antidumping

duties on U.S. imports of silicon metal from Rima equal to 91.06 percent of the value of the imported merchandise (the "Order").[8]

28. When an antidumping duty order is in place, final liquidation of entries of merchandise subject to the order by U.S. Customs is suspended and importers of the merchandise must make cash deposits of estimated antidumping duties at a rate set by the Commerce Department.

29. Each year, interested parties, including the foreign producers subject to an antidumping order, may request an administrative review of the order. In conducting such reviews, the Commerce Department examines the entries into U.S. Customs territory of merchandise subject to the order during an annual period, determines whether imports during the period were dumped, and if so, establishes the rate of antidumping duties to be assessed on entries during the period and the duty deposit rate for future entries.

30. Between 1993 and 2002, Rima repeatedly requested (and the Commerce Department conducted) a number of such administrative reviews of the Order, including reviews of the 1998-1999, 1999-2000, and 2000-2001 periods requested on July 27, 1999, July 31, 2000, and July 31, 2001, respectively.[9]

---

[8]   *Notice of Antidumping Duty Order: Silicon Metal from Brazil*, 56 Fed. Reg. 36,135 (July 31, 1991). The Order also imposed antidumping duties imports of silicon metal from other Brazilian producers ranging from 87.79 to 93.20 percent of the value of the imported merchandise. *Id.*

[9]   *See Silicon Metal From Brazil: Preliminary Results of Antidumping Duty Administrative Review and Notice of Intent Not To Revoke Order in Part*, 65 Fed. Reg. 47,960 (August 4, 2000); *Silicon Metal From Brazil: Preliminary Results of Antidumping Duty Administrative Review and Notice of Intent Not To Revoke Order in Part*, 66 Fed. Reg. 40,980 (August 6, 2001); *Silicon Metal From Brazil: Preliminary Results of Antidumping Duty Administrative Review and Notice of Intent To Revoke Order in Part*, 67 Fed. Reg. 51,593 (August 8, 2002).

31. If a foreign producer meets certain requirements, including sale of the merchandise covered by an antidumping duty order without dumping for at least three consecutive years, it may request revocation of the order as to itself. Rima requested such company-specific revocation of the Order along with its requests for administrative review for the 1999-2000 and 2000-2001 review periods.[10]

32. In determining whether to grant Rima's requests for revocation, the Commerce Department was required to take into account silicon metal sales by any U.S. affiliate of Rima. Under applicable law, "affiliated persons" include: (1) "[a]ny person directly or indirectly owning [or] controlling . . . any organization and such organization"; or (2) any person who "is legally or operationally in a position to exercise restraint or direction over" an organization."[11]

### E. Rima's Fraudulent Concealment of its Affiliate Relationship with Polymet

33. To evade the antidumping Order and applicable laws, and to compete unfairly against Globe in the United States, Rima, Polymet, Vicintin, and Lage developed a plan to use Polymet as Rima's undisclosed U.S. affiliate while intentionally concealing that relationship. Under applicable law, such a relationship must be taken into account in determining whether the imported product is being dumped in the U.S. at illegal, unfairly low prices. As a result of Rima's fraudulent concealment of Polymet's role as its U.S. affiliate, however, the affiliate relationship, including the costs incurred by Polymet in connection with its U.S. sales of silicon metal Rima produced in Brazil, were **not** considered in the Commerce Department's margin

---

[10] *See Silicon Metal From Brazil: Preliminary Results of Antidumping Duty Administrative Review and Notice of Intent Not To Revoke Order in Part*, 66 Fed. Reg. 40,980 (August 6, 2001); *Silicon Metal From Brazil: Preliminary Results of Antidumping Duty Administrative Review and Notice of Intent To Revoke Order in Part*, 67 Fed. Reg. 51,593 (August 8, 2002).

[11] 19 U.S.C. § 1677(33).

calculations.  Such costs would have been deducted from the U.S. prices at which Rima's silicon metal was sold during the review periods.  These required deductions would have reduced the U.S. prices used in the dumping margin calculations, and the margins calculated would have been higher. But because these defendants fraudulently concealed Rima's affiliate relationship with Polymet, the Commerce Department calculated zero or *de minimis* dumping margins for Rima.  As a result, on December 17, 2002, the Commerce Department revoked the Order with respect to Rima.[12]  At the time, Globe was one of only three domestic merchant silicon metal producers.  Globe has been the sole such producer since December 2005.

34. As a result of defendants' material concealment, the Commerce Department concluded that Rima was not engaging in dumping and revoked the antidumping Order.  Had the Commerce Department known that Rima falsely denied its affiliate relationship with Polymet, it would not have revoked the Order as to Rima.

35. Specifically, to investigate Rima's review and revocation application, the Commerce Department requested detailed information from Rima, about, *inter alia*, its corporate structure and affiliations.[13]  For example, in the 2000-2001 administrative review, the Department instructed Rima to:

> Provide an organization chart and description of your company's legal structure.  Include any parent company or subsidiaries of your company and **all other persons affiliated with your company**, and provide a description of all such persons. . . . Describe all aspects of the relationship between your company and each person you name, and describe each person's role (if any) in the manufacturing, sale, and/or development of the product under

---

[12]  *Silicon Metal From Brazil; Final Results of Antidumping Duty Administrative Review and Revocation of Order in Part*, 67 Fed. Reg. 77,225 (December 17, 2002).  The revocation was effective July 1, 2001.

[13]  *See* Rima Response to Section A of the Department of Commerce Antidumping Questionnaire at A-8.

review. . . . If your company has a relationship with another person, but you are unsure whether it meets the Department's definition of "affiliated person," please describe your relationship with that person.[14]

36. In both the organization charts and narrative responses submitted to the Commerce Department's information requests, Rima falsely stated that it has no U.S. affiliate relationships.[15] Indeed, Rima flatly stated that: **"RIMA INDUSTRIAL S/A does not have affiliated companies in the United States . . . ."[16]** Again, this misrepresentation was material to the issue of what costs could be attributed to Rima for purposes of determining whether it was continuing to dump silicon on the U.S. market. Rima also fraudulently concealed its affiliate relationship with Polymet in other submissions to the Commerce Department.[17]

37. Polymet is a small Alabama company with approximately eight employees. It has long been a U.S. distributor of silicon metal imported from Brazil by Rima. Defendant Lage has been an executive of Polymet for many years, and currently acts as its chief executive officer. Globe recently learned Lage was previously employed by another corporate affiliate of Rima, BAV Investments LTDA. He has repeatedly held himself out as a "General Manager" for both Rima and Polymet.

38. Polymet is owned by a Grand Cayman Islands corporation, C.I.V. International Inc., which started Polymet's business in 1980 and owns 100% of the company's capital stock. C.I.V.

---

[14] *Id.* at Exhibits at A-7 to A-8 (emphasis added).

[15] *Id.* at Exhibits A-2, A-7 to A-9.

[16] *Id.* at Exhibit A-2 (emphasis added).

[17] Rima Response to Section A of the Department of Commerce Antidumping Questionnaire at A-3 (December 3, 1999); Rima Response to Section A of the Department of Commerce Antidumping Questionnaire at A-2 (October 11, 2000).

International is a holding company that has no other subsidiaries.  Under Grand Cayman Islands law, the identity of C.I.V. International's shareholders is not publicly disclosed.

39.  At all relevant times, Polymet has been an "affiliate" of Rima within the meaning of U.S. trade regulations.  As set forth above, Rima, Polymet, Vicintin, and Lage knowingly, intentionally, and fraudulently concealed that relationship to obtain revocation of the antidumping Order.

40.  Because these defendants fraudulently concealed Rima's affiliate relationship with Polymet, costs incurred by Polymet in connection with U.S. sales of silicon metal Rima exported from Brazil were not considered in the Commerce Department's dumping margin calculations.

41.  The Commerce Department relied on Rima to provide truthful information about, *inter alia*, its corporate structure and U.S. affiliates in responding to its questionnaires.  As set forth in ¶ 52 below, Globe suffered and continues to suffer injury stemming directly from such reliance.

42.  If the Commerce Department had known that Rima was concealing its affiliate relationship with Polymet and was making false statements regarding that relationship, the Department would have exercised its authority under the antidumping statute to resort to "adverse facts available"[18] in determining the margin of dumping and would not have revoked the Order.

---

[18]  The statutory provision providing for determinations on the basis of facts available, including the use of adverse inferences, is 19 U.S.C. § 1677e.  The Commerce Department's regulations implement this statutory provision at 19 C.F.R. § 351.308.

43. The revocation of the Order with respect to Rima was also a significant material factor in the subsequent revocation of the Order as to all silicon metal imported from Brazil.[19]

44. After the fraudulently-induced revocation of the Order, Rima resumed exporting silicon metal to the U.S. without the price restraints and government scrutiny imposed by that Order.  As the sole domestic U.S. merchant producer of silicon metal since 2005, Globe has been and continues to be directly victimized by defendants' illegal course of conduct.  Prior to the sale of Elkem's U.S. silicon metal operations to Globe in 2005, Elkem also was directly victimized by defendants' illegal course of conduct.

45. Defendants' course of conduct described above was designed to and did conceal their wrongdoing from the Commerce Department and Globe.  Despite the exercise of due diligence, Globe did not have actual or constructive notice of the true facts concerning Polymet's affiliate relationship with Rima.

**F.  Defendants' Schemes and Their Fraudulent Concealment of those Schemes**

46. Employing the aforementioned affirmative acts of fraudulent concealment, defendants Rima, Polymet, Vicintin, and Lage agreed to, and did engage in, the following related and continuing schemes:

- Rima used Polymet to distribute silicon metal it exported from Brazil in the U.S.;

- Because Polymet is the wholly-owned subsidiary of C.I.V. International, a Cayman Islands corporation, the identity of its organizers, owners, officers and directors is not public, thus enabling Rima to conceal its ownership of or control over Polymet;

---

[19]   *Silicon Metal From Brazil and China*, Inv. Nos. 731-TA-471 and 472 (Second Review), USITC Pub. 3892 (December 2006); *Silicon Metal from Brazil: Revocation of Antidumping Duty Order*, 71 Fed. Reg. 76,635 (December 21, 2006).

- Defendants agreed to affirmatively misrepresent that Rima had no U.S. affiliates in submissions to the Commerce Department seeking revocation of the antidumping duty Order; revocation of that Order enabled Rima to resume exporting silicon metal to the U.S. without being subject to the price restraints and other government scrutiny imposed by the Order;

- Having fraudulently obtained revocation of the antidumping duty Order, defendants aggressively used unfair low prices to target domestic customers for diversion from domestic U.S. producers, including Globe;

- The diverted domestic sales and customers enabled defendants to accumulate profits and a sufficient domestic market share to support investment of those profits into a new domestic producer;

- After fraudulently obtaining revocation of the antidumping duty Order, defendants further agreed that profits garnered from Rima's unfair competition, including illegal silicon metal dumping, would be invested in a new silicon production facility to be constructed in the U.S., and that Polymet would be the exclusive distributor of silicon produced by the new plant;

- That facility is now being constructed in Mississippi by MS Silicon, a joint venture in which Rima Holding owns a majority interest.  Rima Holding is owned by Rima and/or Vicintin and was created by defendants as a vehicle to carry out their illegal schemes because, as Lage has stated, "the plant's production [will] not be subject to potential antidumping duties";

- Rima has invested approximately $68 million in the MS Silicon project, money representing a portion of the proceeds of its years of unfair competition and illegal dumping of silicon metal;

- To secure a permit authorizing construction of the Mississippi project, defendants intentionally misrepresented both the plant's production limits and air quality impacts; moreover, their submissions constitute "sham" permitting in that they attempt to expedite construction and circumvent air quality laws and regulations by including misrepresentations regarding the MS Silicon plant's planned mode of operation; and

- Defendants further agreed that the Mississippi plant would, after initially using domestic coal, switch to the use of eucalyptus charcoal produced in Brazil, thus enabling defendants to continue Rima's practice of producing

charcoal from timber illegally harvested from native Brazilian forests, but passed off, through false invoices, as obtained from legitimate sources.[20]

47. Each defendant, including John Does 1 through 50, had knowledge of and participated in, the foregoing schemes.

48. Pursuant to and in furtherance of the above schemes, Rima made false statements to the Commerce Department, concealing its relationship with Polymet in connection with its requests for revocation of the antidumping duty Order on at least the following occasions: December 3, 1999; October 11, 2000; and October 23, 2001.

49. Pursuant to and in furtherance of the above schemes, defendants intentionally misrepresented the capacity and environmental impact of the Mississippi plant to state authorities, including in the permit application and supporting materials submitted to the Mississippi Department of Environmental Quality ("MDEQ") to avoid having to comply with costly U.S. Environmental Protection Agency pollution control requirements. Globe has honored and will continue to honor these pollution control requirements.

**G.  Globe's Discovery of Its Injury**

50. In 2006, Globe, having become aware of facts suggestive of a close relationship between Rima and Polymet, and, in the exercise of due diligence, asked the Commerce Department to investigate that relationship. Defendants' affirmative acts of concealment prevented Globe from obtaining further information as to the Rima/Polymet relationship, and the Commerce Department took no action of which Globe is aware.

---

[20]  Rima, Vicintin, and other Vicintin family members have been indicted in Brazil as part of the "coal mafia" for, among other things, environmental crimes, false statements, money laundering, and tax evasion stemming from these practices.

51. In early 2014, however, news reports about the construction of the new MS Silicon plant revealed previously undisclosed information about the very close relationship between Rima and Polymet. Those news reports identified Lage, CEO of Polymet, as both a director of MS Silicon and an official spokesperson for the $200 million project. It was also announced that Polymet, an Alabama company, would be the exclusive distributor of silicon metal produced by the new Mississippi plant. In particular, the report that Lage – chief executive of a tiny, eight-employee silicon distributor in Alabama – would be both a director of MS Silicon and the $200 million project's official spokesperson indicated that the relationship between Rima and Polymet is not an arm's-length one. Globe subsequently learned that Polymet employees were describing Rima as Polymet's *de facto* parent corporation.

### H. Harm to Globe Caused by Defendants' Schemes

52. As the sole U.S. merchant manufacturer of silicon metal, Globe has suffered and continues to suffer significant harm as a direct and proximate result of defendants' wrongful conduct described above in, *inter alia*, the following ways: (a) lost sales to regular and occasional customers of Globe who purchased silicon metal from Rima directly or through Polymet; (b) lost revenue due to reductions in Globe's sales price necessitated by lower prices charged for silicon metal sold by Rima through Polymet once the restraint imposed by the Order was removed; (c) lost revenue due to an overall reduction in market price caused by such sales; and (d) lost antidumping duty awards under the Byrd Amendment. But for defendants' wrongful conduct, Globe's profits for the relevant years would have been no less than and likely far in excess of $50 million greater than the profits it actually earned during that time period.

### COUNT I
### (RICO – 18 U.S.C. § 1962(c)
### (against Rima)

53. Globe incorporates paragraphs 1 through 52 as if fully pleaded.

54. RICO, 18 U.S.C. § 1962(c), provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**A.   The Enterprise**

55. Globe is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c). Elkem, certain assets of which Globe acquired in 2005, including its legal claims, is also a "person" within the meaning of those provisions.  Both Globe and Elkem fall within the class of victims that Congress intended to protect under the antidumping laws and RICO.

56. Rima is a "person" within the meaning of 18 U.S.C. § 1961(3).  Only Rima is a defendant for purposes of this count.

57. The "enterprise" for purposes of this count is an association-in-fact under 18 U.S.C. § 1961(4).  The members of this association-in-fact are Polymet, Vicintin, and Lage, each of which are individuals, corporations, or legal entities within the meaning of 18 U.S.C. § 1961(4). This association-in-fact was created and exists for the benefit of Rima.  The purpose of this association-in-fact was and is to obtain money by (a) making sales of silicon metal that would not have otherwise been made and diverting revenue and customers to Rima that were rightfully Globe's; (b) depriving Globe, Rima's primary U.S. competitor, of antidumping duties otherwise disbursable under the Byrd Amendment; and (c) depriving the United States of antidumping duties rightfully owed by Rima.  At various times, the association-in-fact has also included John Doe Nos. 1 through 50.  The association-in-fact is characterized by a decision-making structure and a division of labor.  At the direction of Rima, Rima's ownership, control, or other affiliate relationship with Polymet knowingly and intentionally was concealed from the Commerce Department and from Globe to enable Rima to obtain revocation of the Order and resume

dumping silicon in the U.S. at unfairly low prices.   The association-in-fact has the specific purpose of harming Globe and its ongoing customer relationships.   The association-in-fact is dependent on the relationships among its members to accomplish this purpose, is sufficiently continuous and open-ended to pursue and accomplish this purpose, and is separate from the pattern of racketeering activity.   The association-in-fact engages in both lawful and unlawful activity.   The association-in-fact has been in operation for years, continues to date, and threatens to continue indefinitely.   At all relevant times, the association-in-fact was engaged in and affected interstate and foreign commerce in that its investments and other activities caused money, products, supplies, materials, services, and individuals, which originated outside the United States, to travel and be transported into the United States.

58.   At all relevant times, Rima was associated with the association-in-fact enterprise described in ¶ 57.

### B. The Pattern of Racketeering Activity

59.   At all relevant times, Rima did knowingly and intentionally conduct and participate, directly and indirectly, in the management of the association-in-fact enterprise's affairs through a pattern of racketeering activity.   The pattern of racketeering activity consists of multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, money laundering in violation of 18 U.S.C. §§ 1956 and 1957, and violations of the Travel Act, 18 U.S.C. § 1952.

60.   Rima was and is a principal participant in a pattern of racketeering activity that consisted of schemes to defraud three sets of  victims:  (a) domestic silicon producers generally; (b) the largest domestic silicon producer, Globe, specifically; and (c) the United States.

61.   "Racketeering activity" is defined at 18 U.S.C. § 1961(1) to include "any act which is indictable under . . . title 18, United States Code," including § 1341 (relating to mail fraud);

§ 1343 (relating to wire fraud); §§ 1956 and 1957 (relating to money laundering) and § 1952 (relating to the Travel Act).

62. Rima injured Globe in its business or property, as described above, by depriving Globe of (a) sales of silicon metal that it would have otherwise made to regular and occasional customers; (b) revenue due to reductions in sales prices necessitated by the lower sales prices for the silicon metal imported without the restraint of the antidumping Order in place; (c) revenue by causing an overall reduction in market price in the United States; (d) antidumping duty disbursements under the Byrd Amendment; and (e) the protections of the antidumping laws, including their enforcement mechanisms.   Rima further deprived the United States of antidumping duties, and of a domestic silicon market free of dumped silicon from Brazilian producers.

63. As part of the schemes, Rima, in concert with one or more of Polymet, Vicintin, Lage, and John Doe Nos. 1 through 50, knowingly used and caused the use of the U.S. mails on numerous occasions to deliver correspondence and requests for governmental action to (1) facilitate the importation and sale of silicon metal from Brazil at unfairly low or dumped prices; (2) conceal the affiliate relationship between Rima and Polymet; and (3) obtain permits for the planned MS Silicon plant.   Each such use of the U.S. mails constitutes a separate violation of 18 U.S.C. § 1341.   Such mailings, which continue to date, include, but are not limited to, the following:

>   (a)   on or about August 15, 2013, the transmission and delivery to MDEQ of the air permit application to construct the MS Silicon plant;

>   (b)   on or about October 23, 2001, the transmission and delivery to Rima's Washington, D.C. counsel of materials in support of Rima's response to a Commerce Department questionnaire, including Rima's certification of the accuracy of that response;

(c) on or about July 31, 2001, the transmission and delivery to Rima's Washington, D.C. counsel of materials in support of Rima's request for revocation of the antidumping duty Order;

(d) on or about October 11, 2000, the transmission and delivery to Rima's Washington, D.C. counsel of materials in support of Rima's response to a Commerce Department questionnaire, including Rima's certification of the accuracy of that response;

(e) on or about July 31, 2000, the transmission and delivery to Rima's Washington, D.C. counsel of materials in support of its request for revocation of the antidumping duty Order; and

(f) on or about December 3, 1999, the transmission and delivery to Rima's Washington, D.C. counsel of materials in support of Rima's response to a Commerce Department questionnaire, including Rima's false certification of the accuracy of that response.

64. Rima's fraudulent representation that it had no U.S. affiliate has permitted each and every shipment of silicon metal exported to the U.S. by Rima to enter the United States free of the restraints imposed by the antidumping duty Order from the effective date of the Commerce Department's revocation of the Order to the present. Rima had and has a continuing duty to disclose the true facts underlying its relationship with Polymet, and each shipment of silicon metal that Rima has made to the U.S. since the revocation of the Order violated and continues to violate that duty to disclose the true nature of Rima's relationship. Mail and electronic transmissions incident to such shipments are part of the pattern of racketeering activity.

65. As part of the aforementioned and ongoing schemes, Rima, in concert with one or more of Polymet, Vicintin, Lage, and John Does Nos. 1-50, knowingly used and caused the use of numerous electronic transmissions to deliver correspondence and requests for governmental action to (1) facilitate the importation and sale of silicon metal from Brazil at unfairly low or dumped prices; (2) to conceal the affiliate relationship between Rima and Polymet; and (3) obtain permits for the planned MS Silicon plant. Each such transmission made constitutes a

separate violation of 18 U.S.C. § 1343.  Such electronic transmissions, which continue to date,

include, but are not limited to, the following:

(a)   on or about October 10, 2013, the transmission and delivery to MDEQ of Addendum #1 to the MS Silicon air permit application;

(b)   on or about September 12, 2013, the transmission and delivery to MDEQ of responses to questions posed by the U.S. Environmental Protection Agency;

(c)   on or about August 22, 2013, the transmission and delivery to MDEQ of a request for assistance in obtaining air quality emissions information from the state of Alabama;

(d)   on or about August 15, 2013, the transmission and delivery to MDEQ of the air permit application to construct the MS Silicon plant;

(e)   on or about July 5, 2013, the transmission and delivery to MDEQ of a proposed modeling protocol for the MS Silicon plant;

(f)   on or about October 23, 2001, the transmission and delivery to Rima's Washington, D.C. counsel of materials in support of Rima's response to a Commerce Department questionnaire, including Rima's certification of the accuracy of that response;

(g)   on or about July 31, 2001, the transmission and delivery to Rima's Washington, D.C. counsel of materials supporting Rima's request for revocation of the antidumping duty Order;

(h)   on or about October 11, 2000, the transmission and delivery to Rima's Washington, D.C. counsel of materials in support of Rima's response to a Commerce Department questionnaire, including Rima's certification of the accuracy of that response;

(i)   on or about July 31, 2000, the transmission and delivery to Rima's Washington, D.C. counsel of materials supporting Rima's request for revocation of the antidumping duty Order;

(j)   on or about December 3, 1999, the transmission and delivery to Rima's Washington, D.C. counsel of materials supporting Rima's response to a Commerce Department questionnaire, including Rima's false certification of the accuracy of that response; and

(k)   on or about July 27, 1999, the transmission and delivery to Rima's Washington, D.C. counsel of materials supporting Rima's request for revocation of the antidumping duty Order.

66. As part of the aforementioned and ongoing schemes, Rima, in concert with one or more of Polymet, Vicintin, Lage, and John Does Nos. 1 through 50, conducted financial transactions in interstate and foreign commerce involving the proceeds of specified unlawful conduct with the intent to promote the carrying on of specified unlawful activity, or did so knowing that the transactions were designed in whole or in part to conceal or disguise the nature, location, source of ownership, or control of the proceeds of specified unlawful activity. By such conduct, Rima engaged in financial transactions within the meaning of 18 U.S.C. § 1956(c)(4). Rima knew that the funds received from the sale of silicon metal imported from Brazil following the fraudulently-obtained revocation of the antidumping duty Order represented the proceeds of unlawful activity, including mail fraud and wire fraud. Rima knowingly conducted such financial transactions with the intent to promote the carrying on of such unlawful activity. In addition, Rima knowingly conducted and attempted to conduct such financial transactions with the intent to conceal or disguise the nature (proceeds of racketeering activity), source and ownership (Rima), and/or control of the proceeds of the unlawful activity. Each such transaction by Rima, Polymet, Vicintin, Lage, and/or John Doe Nos. 1 through 50, constitutes a separate violation of 18 U.S.C. §§ 1956(a)(1) and 1961(1)(B).

67. Rima, in concert with one or more of Polymet, Vicintin, Lage, and John Does Nos. 1 through 50, transported, transmitted, and transferred monetary instruments or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, or did so knowing that the monetary instruments or funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was designed in

whole or in part to conceal or disguise the nature, the location, the course, the ownership or the control of proceeds of specified unlawful activity. By such conduct, Rima engaged in financial transactions within the meaning of 18 U.S.C. § 1956(c)(4). Among other things, Rima knew that the funds received from the sale of silicon metal imported from Brazil following the fraudulently-obtained revocation of the antidumping duty Order represented the proceeds of unlawful activity, including mail fraud and wire fraud. Rima knowingly conducted such financial transactions with the intent to promote the carrying on of such unlawful activity. In addition, Rima knowingly conducted and attempted to conduct such financial transactions with the intent to conceal or disguise the nature (proceeds of racketeering activity), source and ownership (Rima) and/or control of the proceeds of the unlawful activity. Each such transaction by Rima, Polymet, Vicintin, Lage, and/or John Does Nos. 1 through 50, constitutes a separate violation of 18 U.S.C. §§ 1956(a)(2) and 1961(1)(B).

68. Rima, Polymet, Vicintin, Lage and John Doe Nos. 1 through 50 conspired to commit offenses defined in 18 U.S.C. § 1956, including §§ 1956(a)(1) and 1956(a)(2). By their words and actions, they agreed to accept currency, monetary instruments, and funds representing the proceeds of specified unlawful activity conducted by themselves and their co-conspirators. Each adopted the common purpose of the conspiracy and participated in its consummation. The goal of the money laundering conspiracy was to divert U.S. silicon metal sales from Globe and deprive Globe of money while assuring that the profits derived from the illegal dumping would be distributed for the benefit of Rima, Vicintin, Polymet, Lage, and John Doe Nos. 1 through 50 in a clandestine manner to avoid detection and prosecution.

69. Rima, in concert with one or more of Polymet, Vicintin, Lage, and John Doe Nos. 1 through 50, knowingly engaged or attempted to engage in monetary transactions in the United

States, in criminally-derived property having a value greater than $10,000 and derived from specified unlawful activity in violation of 18 U.S.C. §§ 1957(a), 1957(f)(3), and 1956(c)(7). Defendants engaged in monetary transactions, including deposits, withdrawals, transfers, or exchanges, in or affecting interstate or foreign commerce, involving funds or monetary instruments by, through, or to financial institutions. Defendants knew that the funds received in exchange for the silicon metal Rima exported to the U.S. from Brazil represented the proceeds of specified unlawful activity, including, but not limited to, wire fraud and mail fraud.

70. Rima, Polymet, Vicintin, Lage, and John Does Nos. 1 through 50 traveled in interstate or foreign commerce, and used facilities in interstate and foreign commerce, including the mail, with intent to distribute the proceeds of unlawful activity, and to promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on of unlawful activity, and thereafter performed or attempted to perform unlawful activity in violation of the Travel Act, 18 U.S.C. § 1952. Each knew that the funds provided for such travel represented the proceeds of unlawful activity, including mail and wire fraud.

71. Rima, Polymet, Vicintin, Lage, and John Doe Nos. 1 through 50 each knew that by engaging in the conduct described in §§ 66-70, it/he was laundering, or attempting to launder, the ill-gotten gains achieved through fraudulently obtaining the revocation of the antidumping Order. Each travelled across national borders and otherwise used the facilities of foreign commerce to distribute the proceeds of unlawful activity to benefit Rima. Rima promoted, managed, established, and facilitated such unlawful activity.

72. The above racketeering acts constitute a pattern of racketeering activity under 18 U.S.C. § 1961(5) in that they are (a) related to each other and are related to the ongoing activities

of the enterprise; and (b) continuous in that they have occurred over many years and threaten to continue in the future.

73.  As a direct and proximate result of the pattern of this racketeering activity, Globe has been injured in its business or property as previously described, and Rima has derived unlawful proceeds *inter alia* by: (a) depriving Globe of sales of silicon metal that it would have made had Rima not engaged in these schemes; and (b) evading antidumping duties that would have been assessed had the true nature of Rima's relationship with Polymet been known.

74.  The unlawful activity described above was planned, is prolonged, has formed a pattern of racketeering activity that is interstate and international in scope, has occurred over many years, is ongoing, and continues to date.

75.  By engaging in the conduct described above, Rima violated the prohibitions of 18 U.S.C. § 1962(c).  As a direct and proximate result of the illegal schemes, Globe was harmed, continues to be harmed to date, and is entitled to an award of damages and other relief as provided by RICO.

### COUNT II
### (RICO – 18 U.S.C. §§ 1962(d) and 1962(c))
### (against Rima, Polymet, Vicintin, Lage, and John Doe Nos. 1-50)

76.  Globe incorporates paragraphs 1 through 75 as if fully pleaded.

77.  From in or about 1995, and continuing through the time of filing of this complaint, Rima, Polymet, Vicintin, Lage, and John Doe Nos. 1 through 50 did unlawfully, knowingly, and intentionally conspire, combine, confederate, and agree together to conduct of the affairs of the enterprise (as described in ¶ 57), which was engaged in, and the activities of which affected, interstate and foreign commerce, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  Rima, Polymet, Vicintin, Lage, and John Doe Nos. 1 through 50 are all

defendants for purposes of this count.  At all relevant times, each defendant had an independent interest and stake in the financial benefits flowing from the racketeering acts.

78.  Each defendant agreed that at least two acts of racketeering activity would be committed by a member of the conspiracy in furtherance of the enterprise.

79.  It was part of the conspiracy that these defendants and their co-conspirators would commit, and did commit, numerous acts of racketeering activity in the conduct of the affairs of the enterprise, including, but not limited to, the acts of racketeering set forth below.  The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), includes multiple repeated acts of:

    (a)    mail fraud, 18 U.S.C. § 1341, as described in ¶ 63;

    (b)    wire fraud, 18 U.S.C. § 1343, as described in ¶ 65;

    (c)    money laundering, 18 U.S.C. §§ 1956 and 1957, as described in ¶¶ 66-69; and

    (d)    interstate and foreign travel or transportation in aid of racketeering enterprises, 18 U.S.C. § 1952, as described in ¶ 70.

80.  As a direct and proximate result of this conspiracy, and the acts and omissions taken in furtherance thereof and constituting "racketeering activity" within the meaning of 18 U.S.C. § 1961, Globe was harmed, continues to be harmed to date, and is entitled to an award of damages and other relief provided by RICO.

## COUNT III
### (RICO – 18 U.S.C. § 1962(a)
### (against all defendants)

81.  Globe incorporates paragraphs 1 through 52 as if fully pleaded.

82.  RICO, 18 U.S.C. §§ 1962(a), provides:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such

income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

## A. The Enterprise

83.  Globe is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c). Elkem, certain of the assets of which Globe acquired in 2005, including its legal claims, is also a "person" within the meaning of those provisions. Both Globe and Elkem fall within the class of victims that Congress intended to protect under the antidumping laws and RICO.

84.  Rima, Polymet, Vicintin, Lage, Rima Holding, MS Silicon, and John Doe Nos. 1 through 50 are all "persons" within the meaning of 18 U.S.C. § 1961(3). All are defendants for purposes of this count.

85.  The "enterprise" for purposes of this count is MS Silicon, which represents the tool or instrument used by defendants to achieve their ultimate objective – the investment of the proceeds of their unlawful conduct into the construction and operation of a domestic U.S. silicon metal plant not subject to the antidumping duty laws applicable to imported silicon metal. Defendants intended and intend to use this enterprise to obtain money by (a) making sales of silicon metal that would not otherwise have been made and diverting revenue that was rightfully Globe's to the enterprise, and ultimately, to Rima; (b) depriving Globe, Rima's primary U.S. competitor, of antidumping duties under the Byrd Amendment; (c) depriving the United States of antidumping duties rightfully owed by Rima; and (d) investing the proceeds of their illegal conduct and unfair competition in the construction and operation of the new silicon metal production facility through Rima Holding and MS Silicon. Rima, Vicintin, Lage, and others fraudulently concealed Rima's ownership, control, or other affiliate relationship with Polymet from the Commerce Department to enable Rima to obtain revocation of the Order and resume

selling silicon metal in the U.S. at unfairly low prices, and to invest the proceeds of that fraudulent activity in the construction and operation of the new silicon metal production facility through Rima Holding and MS Silicon.   The enterprise is separate from the pattern of racketeering activity and engages in both lawful and unlawful activity.  The enterprise has been in operation for years, continues to date, and threatens to continue indefinitely.  At all relevant times, the enterprise has engaged in and affected interstate and foreign commerce in that its activities caused money, products, supplies, materials, services, and individuals located outside the United States, to travel and be transported into the United States.

86.  **In the alternative**, the "enterprise" for purposes of this count is an association-in-fact under 18 U.S.C. § 1961(4).  This association-in-fact was created and exists for the benefit of Rima.   The members of this association-in-fact are Rima, Polymet, Vicintin, Lage, Rima Holding, and MS Silicon.  The purpose of this association-in-fact was and is to obtain money by (a) making sales of silicon metal that would not have otherwise been made and diverting revenue to Rima that was rightfully Globe's; (b) depriving Globe, Rima's primary U.S. competitor, of antidumping duties under the Byrd Amendment; (c) depriving the United States of antidumping duties; and (d) investing the proceeds of their illegal conduct and unfair competition in the construction and operation of the new silicon metal production facility through Rima Holding and MS Silicon.  At various times, the association-in-fact has also included John Doe Nos. 1 through 50.  The association-in-fact is characterized by a decision-making structure and a division of labor.  Rima, Vicintin, Lage, and others fraudulently concealed Rima's ownership, control, or other affiliate relationship with Polymet from the Commerce Department to enable Rima to obtain revocation of the Order and resume selling silicon metal in the U.S. at unfairly low prices, and to invest the proceeds of that fraudulent activity in the construction and operation

of the new silicon metal production facility through Rima Holding and MS Silicon. The association-in-fact has the purpose of harming Globe, is dependent on the relationship among its members to accomplish this purpose, is sufficiently continuous and open-ended to pursue this purpose, and is separate from the pattern of racketeering activity. The association-in-fact engages in both lawful and unlawful activity. The association-in-fact has been in operation for years, continues to date, and threatens to continue indefinitely. At all relevant times, the association-in-fact was engaged in and affected interstate and foreign commerce in that its investments and other activities caused money, products, supplies, materials, services, and individuals, which originated outside the United States, to travel and be transported into the United States.

87. At all relevant times, Rima, Polymet, Vicintin, Lage, Rima Holding, MS Silicon, and John Doe Nos. 1 through 50 were persons within the meaning of 18 U.S.C. § 1961(3), associated with the association-in-fact enterprise described in ¶ 86.

**B. The Pattern of Racketeering Activity**

88. At all relevant times, Rima, Polymet, Vicintin, Lage, Rima Holding, MS Silicon, and John Doe Nos. 1 through 50 did knowingly and intentionally conduct and participate, directly and indirectly, in the management of the enterprise's affairs (or the alternative enterprise's affairs) through a pattern of racketeering activity. The pattern of racketeering activity consists of multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, money laundering in violation of 18 U.S.C. §§ 1956 and 1957, and violations of the Travel Act, 18 U.S.C. § 1952.

89. The defendants were principal participants in a pattern of racketeering activity that consisted of schemes to defraud three sets of victims: (a) domestic silicon producers generally; (b) Globe, the largest domestic silicon producer, specifically; and (c) the United States.

31

90. Globe incorporates paragraphs 61 through 73 as to all defendants as if fully pleaded.

91. The unlawful activity described above was planned, is prolonged, and has formed a pattern of racketeering activity that is interstate and international in scope, has occurred over many years, is ongoing and continues to date.

92. Globe is directly harmed by defendants' investment of their ill-gotten gains in the new MS Silicon facility – as well as in Rima, Polymet, and C.I.V. International – in that the investment creates a new domestic silicon metal competitor with an unfair competitive advantage resulting, *inter alia*, from (a) avoiding the true costs of production of silicon metal, including the costs of compliance with federal and state environmental protection and other regulatory regimes by evading applicable federal and state laws; (b) the state and federal subsidies granted to MS Silicon; (c) MS Silicon's ability to supply buyers in closer geographic proximity to MS Silicon at lower prices than Globe can; and (d) and MS Silicon's ability to continue servicing customers unfairly taken from Globe as a result of Rima's dumping of silicon in the U.S. market following revocation of the antidumping duty Order. In short, defendants' investment in MS Silicon and misrepresentations to MDEQ continues the pattern of deception begun with Rima's false and fraudulent representations to the Commerce Department and furnishes defendants with a new means of competing unfairly with Globe – one that was contemplated since the inception of defendants' illegal schemes.

93. By engaging in the conduct described above, each defendant violated the prohibitions of 18 U.S.C. § 1962(a). Defendants' investment of the proceeds of their illegal activity in MS Silicon – and in Rima, Polymet, and C.I.V. International – for purposes of constructing and operating the MS Silicon plant damages Globe directly by providing defendants with a new, more effective illegal means of undercutting Globe's sales. As a direct and

proximate result of defendants' illegal schemes, Globe was harmed, continues to be harmed to date, and is entitled to an award of damages and other relief as provided by RICO.

## COUNT IV
### (RICO – 18 U.S.C. §§ 1962(d) and 1962(a))
### (against all defendants)

94. Globe incorporates paragraphs 1 through 52 and 62 through 74 as if fully pleaded.

95. From in or about 1995, and continuing through the time of filing of this complaint, Rima, Polymet, Vicintin, Lage, Rima Holding, MS Silicon, and John Doe Nos. 1 through 50 did unlawfully, knowingly, and intentionally conspire, combine, confederate and agree together to conduct of the affairs of the enterprise (as described in ¶ 85 or, in the alternative, ¶ 86), which was engaged in, and the activities of which affected, interstate and foreign commerce, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(a).  Rima, Polymet, Vicintin, Lage, Rima Holding, MS Silicon, and John Doe Nos. 1 through 50 are all defendants for purposes of this count.

96. Each defendant agreed that at least two acts of racketeering activity would be committed by a member of the conspiracy in furtherance of the enterprise.

97. It was part of the conspiracy that these defendants and their co-conspirators would commit, and did commit, numerous acts of racketeering activity in the conduct of the affairs of the enterprise, including, but not limited to, the acts of racketeering set forth below.  The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), includes multiple repeated acts of:

(a)    mail fraud, 18 U.S.C. § 1341, as described in ¶ 63;

(b)    wire fraud, 18 U.S.C. § 1343, as described in ¶ 65;

(c)    money laundering, 18 U.S.C. §§ 1956 and 1957, as described in ¶¶ 66-69; and

(d)   interstate and foreign travel or transportation in aid of racketeering enterprises, 18 U.S.C. § 1952, as described in ¶ 70.

98.   As a direct and proximate result of this conspiracy, and the acts and omissions taken in furtherance thereof and constituting "racketeering activity" within the meaning of 18 U.S.C. § 1961, Globe was harmed, and continues to be harmed, and is entitled to an award of damages and other relief as provided by RICO.

**COUNT V**
**(Declaratory Judgment)**
**(against all defendants)**

99.   Globe incorporates paragraphs 1 through 52 as if fully pleaded.

100.   As set forth above, in determining whether to grant Rima's requests for revocation of the antidumping duty Order, the Commerce Department was required to take into account silicon metal sales by U.S. affiliates of Rima.

101.   Under applicable law, Polymet was, at all relevant times, a U.S. affiliate of Rima. Accordingly, that affiliate relationship, including the costs incurred by Polymet in connection with its U.S. sales of silicon metal Rima exported from Brazil were required to be considered in the Commerce Department's investigation of Rima's request for revocation of the antidumping duty Order.  Because of defendants' fraudulent concealment of the affiliate relationship between Rima and Polymet, however, that relationship and the costs incurred by Polymet were not taken into account in the Commerce Department's margin calculations.  As a result, the Department calculated zero or *de minimis* dumping margins for Rima and revoked the Order.

102.   Rima obtained revocation of the Order based upon its knowing, intentional, and fraudulent concealment of material facts from the Commerce Department.

103.   The revocation of the Order enabled Rima to resume its illegal, anticompetitive practices free from the Order's price restraints and other government scrutiny and to invest the

ill-gotten gains of that illegal conduct in the planned MS Silicon production facility.

104. The permits issued for the MS Silicon facility constitute "sham" permitting in that defendants' applications knowingly and willfully misrepresented (1) the plant's planned mode of operation; (2) its production limits; and (3) its air quality impacts.

105. Pursuant to the provisions of 28 U.S.C. §§ 2201, 2202, and 1651, Globe is entitled to (a) a declaratory judgment that Rima obtained revocation of the antidumping duty Order by fraudulently concealing and/or misrepresenting material facts relating to its lack of U.S. affiliates; (b) a declaratory judgment that, to achieve revocation of the Order, Rima engaged in illegal anticompetitive practices that damaged both Globe and the U.S. government; (c) a declaratory judgment that all defendants fraudulently misrepresented material facts as to the environmental impact, planned production mode, and production limits of the MS Silicon plant to secure permits for its construction; (d) a declaratory judgment that defendants are investing the ill-gotten gains of their years of illegal and anticompetitive practices in the MS Silicon plant as well as in Rima, Polymet, and C.I.V. International; and (e) further necessary or proper relief.

## COUNT VI
### (Tortious Interference with Business Relations)
### (against Rima, Polymet, Vicintin, Lage, and John Doe Nos. 1-50)

106. Globe incorporates paragraphs 1 through 52 as if fully pleaded.

107. Globe, as one of the only domestic producers of silicon metal and since 2005, the only U.S. merchant producer of silicon metal, had business relationships with many companies in all of the three primary markets in the United States for silicon metal: (a) chemical, (b) primary aluminum, and (c) secondary aluminum. Rima, Polymet, Vicintin, Lage, and John Doe Nos. 1 through 50 all knew of those business relationships and, through the conduct described above, intentionally interfered with them. Defendants acted out of malice and used

dishonest, unfair, and improper means, including, but not limited to, the unlawful acts alleged in this complaint. Defendants' interference proximately caused injury to Globe's business relationships.

108. Defendants' conduct was malicious, wanton, and reckless.

109. As a direct and proximate result of defendants' tortious interference with Globe's business relations, Globe was harmed, continues to be harmed, and is entitled to an award of damages, including compensatory and punitive damages, as well as other legal and equitable relief.

## COUNT VII
### (Tortious Interference with Prospective Advantage)
### (against Rima, Polymet, Vicintin, Lage, and John Doe Nos. 1-50)

110. Globe incorporates paragraphs 1 through 52 as if fully pleaded.

111. Globe, as one of the only domestic producers of silicon metal and since 2005, the only U.S. merchant producer of silicon metal, had definite and specific prospective advantages or opportunities to sell silicon metal in all three primary markets in the United States: (a) chemical, (b) primary aluminum, and (c) secondary aluminum. Rima, Polymet, Vicintin, Lage, and John Doe Nos. 1 through 50 all knew of those prospective advantages and opportunities and, through the conduct described above, intentionally interfered with them. Defendants acted out of malice and used dishonest, unfair, and improper means, including, but not limited to, the unlawful acts alleged in this complaint. Defendants' interference proximately impaired the prospective advantages and opportunities.

112. Defendants' conduct was malicious, wanton, and reckless.

113. As a direct and proximate result of defendants' tortious interference with Globe's prospective advantages and opportunities, Globe was harmed, continues to be harmed, and is

entitled to an award of damages, including compensatory and punitive damages, as well as other legal and equitable relief.

## COUNT VIII
### (Civil Conspiracy)
### (against all defendants)

114. Globe incorporates paragraphs 1 through 52 as if fully pleaded.

115. Pursuant to an agreement and understanding, defendants Rima, Polymet, Vicintin, Lage, Rima Holding, MS Silicon, and John Doe Nos. 1 through 50 all conspired to commit and did commit the unlawful acts and misrepresentations set forth in ¶¶ 27-52, 59-71, 73-74, and 88-92 (all incorporated as if fully pleaded). The purposes of this conspiracy and common schemes were to tortiously interfere with Globe's business relations and prospective advantages and opportunities and to divert monies to defendants that otherwise would have been earned by Globe.

116. Defendants' conduct was malicious, wanton, and reckless.

117. As a direct and proximate result of this conspiracy, Globe was harmed, continues to be harmed, and is entitled to an award of damages, including compensatory and punitive damages, as well as other legal and equitable relief.

## COUNT IX
### (Unjust Enrichment)
### (against all defendants)

118. Plaintiff incorporates paragraphs 1 through 52 as if fully pleaded.

119. Through their wrongful actions described above, defendants have, for more than a decade, sold silicon metal imported from Brazil in the U.S. at unfairly low prices. In so doing, defendants have wrongfully diverted silicon metal sales and profits from Globe, the largest domestic U.S. producer and, since 2005, the only U.S. merchant manufacturer of silicon metal.

120. By reason of the foregoing, defendants have been unjustly enriched at Globe's expense.

121. As a direct and proximate result of defendants' conduct, Globe has been damaged and is entitled to relief.

## PRAYER FOR RELIEF

WHEREFORE, Globe prays that this court enter judgment against defendants, jointly and severally, and ask the Court to:

A. issue a judgment that (i) declares that Rima obtained revocation of the antidumping duty Order by fraud; (ii) declares the MS Silicon construction permits are sham permits obtained by fraud; and (iii) declares that defendants are investing the ill-gotten gains from their illegal, anticompetitive practices in the MS Silicon plant, as well as in Rima, Polymet, and C.I.V. International.

B. issue a permanent injunction preventing defendants from proceeding with the construction and operation of the MS Silicon plant;

C. order defendants to pay Globe an amount equal to all profits that defendants received from the sale of silicon metal in the U.S. following revocation of the Commerce Department's antidumping duty Order as to Rima;

D. award Globe compensatory damages in an amount to be determined at trial, but not less than $50 million;

E. award Globe the actual damages resulting from the RICO violations in an amount to be determined at trial, but not less than $50 million, and treble that amount;

F. award Globe punitive damages in an amount to be determined at trial, but not less than $50 million;

G. award prejudgment interest;

H.  award Globe its attorney's fees, costs, and disbursements incurred in prosecuting this action; and

I.  grant such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Globe demands a trial by jury of all claims so triable.

Respectfully submitted,

  /s/
_____
Charles B. Wayne (# 935858)
Lucinda J. Bach (# 375366)
DLA Piper LLP (US)
500 8th Street, N.W.
Washington, D.C. 20004
(202) 799-4253
(202) 799-5253 (fax)
charles.wayne@dlapiper.com
lucinda.bach@dlapiper.com

*Counsel for Plaintiff*